UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| HOLLY M. COOPER, | CASE NO. 3:22-CV-01248-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Holly Cooper challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On July 15, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated July 15, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Cooper filed for SSI on July 18, 2019 and DIB on August 7, 2019, alleging a disability onset date of July 16, 2015. (Tr. 235, 242). Her claims were denied initially and on reconsideration. (Tr. 76-90, 94-103). Ms. Cooper then requested a hearing before an

1

administrative law judge. (Tr. 105-06). Ms. Cooper (represented by counsel) and a vocational

expert (VE) testified at a hearing before the ALJ on May 28, 2021. (Tr. 39-60). On June 8, 2021,

the ALJ issued a written decision finding Ms. Cooper not disabled. (Tr. 10-32). The Appeals

Council denied Ms. Cooper's request for review, making the hearing decision the final decision of

the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms.

Cooper timely filed this action on July 15, 2022. (ECF #1).

FACTUAL BACKGROUND

I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Cooper was 24 years old on her alleged onset date, and 30 years old at the

administrative hearing. (Tr. 42). She completed high school, and previously worked as a

cosmetologist. (Tr. 43, 52).

II.    RELEVANT MEDICAL EVIDENCE

On July 20, 2015, Ms. Cooper sought care at Northern Ohio Medical Specialists (NOMS)

Healthcare with complaints of vomiting. (Tr. 560). She presented on examination with mild left

upper quadrant abdominal tenderness and was started on omeprazole. (Tr. 561). Three days later,

she presented with abdominal tenderness and was prescribed Zofran. (Tr. 557-58). An abdominal

scan showed no acute findings. (Tr. 359, 394).

On August 14, 2015, Ms. Cooper sought care for generalized abdominal pain, nausea,

weight loss, and a change in her bowels, as well as some arthritis and joint swelling. (Tr. 392, 508).

No abnormal medical signs were noted on examination. (*Id.*). She was prescribed a colon cleansing

agent and an antispasmodic. (Tr. 393). On August 26, Ms. Cooper again sought care for

gastrointestinal symptoms, though no abnormal medical signs were appreciable. (Tr. 349). An

2

esophagogastroduodenoscopy (EGD) showed a small hiatal hernia. (Tr. 351). Additional examinations on September 1, September 15, and October 16 produced no abnormal findings. (Tr. 504, 506, 724).

On January 6, 2016, Robert G. Haladay, M.D. examined Ms. Cooper, who presented with fourteen positive tender points and some patellar tenderness. (Tr. 375-76). Dr. Haladay described Ms. Cooper as being "extremely vague" about the location of her pain. (Tr. 375). She was prescribed Flexeril. (Tr. 376).

Ms. Cooper began occupational physical therapy on January 18, 2016 and completed twelve sessions. (Tr. 339). By February 15, Ms. Cooper had made "good improvement in strength and endurance" but was "still having some pain." (Tr. 342). She was recommended an additional nine sessions over three weeks. (*Id.*). No abnormal medical findings were noted during treatment on February 26, April 24, September 26, or September 29. (Tr. 498, 500, 502, 621). A gastrointestinal scan on October 4 also yielded normal findings. (Tr. 337).

Ms. Cooper was noted to be anxious on March 8, 2017 (Tr. 554) and September 11, 2017 (Tr. 551-52). On November 11, 2017, her mood was described as sad, and she reported widespread pain consistent with fibromyalgia. (Tr. 370-71). She reported doing well on Cymbalta and Lyrica. (Tr. 371). She was prescribed gentle aerobic exercise. (*Id.*).

On September 18, 2018, Ms. Cooper presented with mild abdominal distention. (Tr. 715-16).

During evaluations at NOMS Healthcare on June 10, July 12, and August 9, 2019, Ms. Cooper was less fidgety and making better eye contact than before (Tr. 516, 519, 522), though

3

prior examinations at that facility noted no clinically significant deficits with eye contact or unusual motor activity. (*See, e.g.*, Tr. 525, 528, 531, 534, 536, 539, 542, 545-46).

On October 15, 2019, Ms. Cooper attended a consultative examination with Marsha Cooper, M.D. (Tr. 624-34). On examination, Ms. Cooper demonstrated a restricted range of dorsolumbar motion: 75/90 degrees with flexion, 0/30 degrees with extension, and 15/30 degrees with lateral flexion bilaterally. (Tr. 627). Dr. Cooper noted, "[i]n the erect position there is still a scoliosis noted with some winging of the right scapular region." (Tr. 630). There was also scarring from prior scoliosis surgeries, hyperreflexia in the left upper extremity as compared to the other extremities, brisk ankle jerks, and poor eye contact during the examination. (Tr. 627, 631). All other findings were within normal limitations, including normal gait, strength, straight leg raise testing, and sensory testing. (Tr. 625-28, 630-31).

On November 6, 2019, Ms. Cooper sought care at Firelands Regional Medical Center with complaints of a feeling as though there was a bug in her ear. (Tr. 647-48). On examination, there was a small erythematous area just within the vestibule of the right ear. (Tr. 647). She was referred to an ear, nose, and throat specialist. (Tr. 648). That same day, Ms. Cooper presented at NOMS Healthcare disheveled with a noticeable odor. (Tr. 657). She was uncooperative and at times unable to reason. (*Id.*). She made poor eye contact and was described as panicky. (*Id.*). She was also noted to have heightened upper extremity reflexes with a visible tremor. (Tr. 658). Her right ear was irrigated, and she was started on fluticasone propionate for ear effusion. (Tr. 659). She was referred to a neurologist for her tremor and her counselor for her manic state and tactile hallucinations. (Tr. 658).

Ms. Cooper followed up with the neurologist on December 12, 2019, at which time she presented with a very flat affect, evidence of a prior fusion in her spine, and normal to trace increase in muscle tone. (Tr. 675). Tremors were observed in the bilateral upper extremity and described as "fine" and with "low amplitude high frequency," "best seen with posture but also present at rest and with movement." (*Id.*). Examination also revealed hyperactive reflexes and a positive Hoffman's test. (*Id.*). Ms. Cooper's physician discontinued bupropion and referred her for scans of her cervical spine and head. (*Id.*). A December 31, 2019 cervical spine x-ray was unremarkable (Tr. 642) and a cervical spine MRI study showed only minimal posterior disc bulging (Tr. 643). A head MRI study showed early frontoparietal parenchymal volume loss. (*Id.*).

Ms. Cooper presented as anxious when seeking care for a possible yeast infection on January 14, 2020. (Tr. 654, 957). Upon returning to care with the neurologist on January 29, 2020, Ms. Cooper reported that her tremors had "greatly" improved after bupropion was discontinued. (Tr. 682). She also denied any hallucinations. (*Id.*). An examination reproduced the findings from December 2019. (*Id.*). Her doctor prescribed propranolol for migraine headaches. (Tr. 683). The remaining examinations with the neurologist—which were performed in November and December 2020 and February 2021—yielded evidence of a guarded affect, diffusely hyperactive reflexes with Hoffman's signs, and "very subtle" postural tremors. (Tr. 763, 766, 769). She was prescribed Ajovy for her migraines, which produced significant improvement, though she reported the benefit began to wear off at the end of the month. (Tr. 764).

On March 29, 2021, Ms. Cooper returned to NOMS Healthcare, accompanied by her mother. (Tr. 945). She reported wanting to get her conditions "cleared up" because she was going to be in a wedding. (*Id.*). On examination, Ms. Cooper appeared "chronically ill-appearing" and

mildly disheveled with an anxious and depressed mood, slow movements, diminished speech, and poor eye contact. (Tr. 946). She presented with widespread tenderness consistent with fibromyalgia. (Tr. 946-47). She exhibited hyperreflexia in the upper extremities and 4 out of 5 (5 being full) bilateral grip strength. (Tr. 947). She looked to her mother before answering questions. (*Id.*). Her doctor increased the Lyrica dosage and referred Ms. Cooper to a physical therapist. (Tr. 947-48).

Ms. Cooper began receiving counseling and medication management for her mental impairments through Firelands Counseling. (Tr. 433). On August 4, 2015, she described her mood as overwhelmed and anxious. (Tr. 435). During therapy on September 17, 2015, Ms. Cooper reported being employed at a salon and being put into a position of lying about her licensure. (Tr. 437). Therefore, she intended to resign. (*Id.*). She presented with a blunted affect on October 20, 2015 (Tr. 439), February 8, 2017 (Tr. 451) and February 20, 2018 (Tr. 718). No abnormalities were noted at her appointment on May 15, 2018. (Tr. 463). On May 17, 2018, she reported caring for a dog, two cats, three guinea pigs, and two snakes. (Tr. 465). On August 1, 2018, she reported taking care of three cats, one dog, fifteen birds, and two snakes. (Tr. 469). On examination, she was mildly withdrawn with some hesitancy of speech. (*Id.*). A mental status examination on October 25, 2018 yielded normal findings. (Tr. 471). On January 24, 2019, she presented with an anxious mood and flat affect. (Tr. 474).

By April 18, 2019, Ms. Cooper had stopped taking her anti-anxiety medication and reported stress related to planning her wedding. (Tr. 476, 478). She presented as restless and disheveled with avoidant gaze, stuttering, an anxious mood, and a labile affect. (Tr. 479). She was started on Wellbutrin. (Tr. 480). She continued to present with similar abnormalities through

November 2019 while dealing with increased life stressors, including her fiancé's disabling illnesses and her grandmother's cancer diagnosis. (Tr. 484-85, 636-37, 639). On May 26, 2020, examination noted her fund of knowledge was limited. (Tr. 834-35). She was resumed on psychotropic medications, including duloxetine, chlorpromazine, Rexulti, and doxepin. (Tr. 835-36). On June 23, 2020, her mental impairments were "controlled," and a mental status examination yielded normal findings. (Tr. 829, 830-31). Those findings were reproduced on September 8, 2020. (Tr. 825-26). On January 18, 2021, Ms. Cooper presented as anxious with a constricted affect, impoverished speech, and circumstantial thinking. (Tr. 822-23). She was prescribed duloxetine, buspirone, and Prozac. (Tr. 823-24). On February 15, 2021, she again presented with a constricted affect and impoverished speech. (Tr. 817-18). Her mental impairments were again characterized as "controlled." (Tr. 815).

### III.  MEDICAL OPINIONS

On September 23, 2019, state agency consultant Erika Gilyot-Montgomery, Psy.D., found Ms. Cooper had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing herself. (Tr. 67-68, 82-83). Dr. Gilyot-Montgomery further found Ms. Cooper would have moderate limitations in concentrating, persisting, and maintaining pace in simple and detailed tasks for a 40-hour workweek and would do best with routine tasks and no more than occasional changes. (Tr. 72-73, 87-88).

On April 14, 2020, state agency consultant Irma Johnston, Psy.D., found Ms. Cooper had a mild limitation in understanding, remembering, or applying information; a moderate limitation

in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing herself. (Tr. 97-98, 108-09). Dr. Johnston further found that Ms. Cooper could sustain attention and concentration on simple, repetitive, one- to two-step tasks in a work setting where there would be no demand for a fast pace; sustain superficial, occasional contact with the general public, co-workers, and supervisors where she would not be expected to maintain a friendly, persuasive demeanor; and adapt to a work setting in which duties were routine and predictable and in which she was not expected to adhere to strict production standards. (Tr. 101-02, 112-13).

On November 10, 2019, state agency consultant Laura Rosch, D.O., found Ms. Cooper could perform work at the light exertional level, but could only occasionally stoop, kneel, and crouch. (Tr. 70-72, 85-87). On April 16, 2020, state agency consultant Abraham Mikalov, M.D., confirmed Dr. Rosch's findings, but further found Ms. Cooper could never climb ladders, ropes, or scaffolds and needed to avoid all exposure to hazards (machinery, heights, etc.). (Tr. 99-100, 110-11). In October 2019, consultative psychiatrist Dr. Cooper opined it was advisable Ms. Cooper "do no jobs that require frequent bending, nor should she lift any heavy objects as part of a job that would require lifting due to her spinal matters." (Tr. 631). Additionally, Dr. Cooper observed, "she has no difficulty however with her gait, ambulation, fingering, manual dexterity, speech, and has no difficulty with sitting, standing, and does not require assistive devices for her gait." (*Id.*).

On April 19, 2021, Ms. Cooper underwent a functional capacity evaluation (FCE) with Matthew Hamlin, PT. (Tr. 924-44). On examination, she presented with a loss of cervical range of motion of between 50 and 75 percent in all directions with end range pain. (Tr. 926). She was

8

lacking terminal knee flexion due to complaints of lower back pain. (*Id.*). She had mild difficulty with Jamar Maximum Voluntarily Effort grip strength testing. (Tr. 927). The results indicated "variable levels of effort [were] given." (*Id.*). Overall, reliability measures suggested "near" full effort. (Tr. 929-31, 937). Testing indicated a capacity for frequent sitting; occasional pushing and pulling of five pounds; occasional carrying ten pounds; occasional lifting below shoulder-height of ten pounds; and occasional standing, walking, balancing, and fine motor dexterity. (Tr. 937). Overhead lifting was not recommended. (*Id.*). He wrote, "as a result of the test procedures, Ms. Cooper is determined to be able to safely perform work within the 'Sedentary' category," as defined by the Dictionary of Occupational Titles (DOT). (Tr. 937). PT Hamlin also opined it was unlikely Ms. Cooper could consistently attend work and perform for an employer. (Tr. 938).

On May 4, 2021, Cassandra Case, NP, completed a "Physical Medical Source Statement." (Tr. 1088-94). NP Case adopted the findings of the FCE and further opined Ms. Cooper would be absent from work more than four days per month. (Tr. 1090-94). She identified bilateral trigger point tenderness, generalized weakness, visible ease of becoming overwhelmed/anxious, mild postural tremors, and hyperactive reflexes as supporting her opinion. (Tr. 1088).

## IV.  ADMINISTRATIVE HEARING

Ms. Cooper and VE Paula Zinsmeister testified at an administrative hearing held via telephone on May 28, 2021.

Ms. Cooper lives with her parents and sister. (Tr. 42). She has never had a driver's license. (Tr. 43). Ms. Cooper is a licensed cosmetologist. (*Id.*). She cannot work because of her fibromyalgia, chronic fatigue, chronic migraines, IBS, severe anxiety, and severe depression. (Tr. 44).

After the hearing began, the ALJ asked if someone was helping Ms. Cooper testify because there was a long pause before she answered each question. (Tr. 45). Ms. Cooper denied this, explaining she suffers from "fibro fog" due to her fibromyalgia, which causes memory problems, making it difficult to answer questions immediately. (*Id.*).

Ms. Cooper testified she can walk three blocks and stand for only five minutes due to her pain and fatigue. (Tr. 44-45). She can bend at the waist and squat using her knees. (Tr. 45). She is right-handed and has some problems using her hands due to tremors. (*Id.*). Although not instructed to by a doctor, she limits the amount she lifts to ten pounds. (*Id.*). She can sit for a couple of hours. (Tr. 46). Most nights, she gets eight to ten hours of sleep, but it is broken up and supplemented with daytime naps, which typically last four hours a day. (*Id.*). She requires help when using the shower and her mother washes her hair due to the fatigue in her arms. (*Id.*). Ms. Cooper is capable of cooking, but she does not use a stove and uses the microwave. (*Id.*). She cannot do many household chores, including vacuuming, sweeping, or laundry. (*Id.*).

Although since resolved, she previously experienced hallucinations, believing there were bugs in her ear and in her hair. (Tr. 47). She has lost hair due to her fibromyalgia. (*Id.*). She picks her skin and pulls out her eyelashes due to anxiety and OCD. (Tr. 48). She does not go out with friends, play sports, go to the movies, or read. (*Id.*). She enjoys listening to music and watching YouTube videos. (*Id.*). She likes plants and has "always been into nature" but "can't really do much about it." (*Id.*).

Ms. Cooper was previously engaged. (Tr. 49). She and her fiancé were together for three years and ended things nearly a year before the hearing. (*Id.*). The two saw each other infrequently due to both being in poor health, only meeting anywhere between once a month to twice a year.

(*Id.*). She does not leave the house often other than for doctor's appointments. (*Id.*). Occasionally she will accompany her parents to the store if she is already out for a doctor's appointment but stated it was "rare for me to get out." (Tr. 50). Ms. Cooper believes the medication she takes is helping to a degree, but her health still gets in the way of her everyday life at home. (*Id.*). She regrets not being able to help around the house, and she feels like a burden. (*Id.*).

She received several surgeries for scoliosis, which corrected the problem "as much as they could." (*Id.*). She still has a curvature and a hump on one side that is painful every day. (Tr. 50-51). Her fibromyalgia causes pain all the time, but her scoliosis pain is on and off. (Tr. 51). She also gets dizzy and will black out from very little exertion. (*Id.*).

VE Zinsmeister then testified. She classified Ms. Cooper's previous work as cosmetologist (DOT 332.271-010, SVP 6, light physical demand as classified and as performed) and manicurist (DOT 331.674-010, physical demand sedentary as classified and as performed). (Tr. 52). Because the two were performed together, the VE classified them as a composite job, rendering the demand level the higher of the two: light. (*Id.*).

**Hypothetical One.** VE Zinsmeister first assumed a hypothetical individual of the claimant's age, education, and work experience with the residual functional capacity to perform work at the light exertional level subject to the following limitations: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; frequent use of the bilateral upper extremities for reaching, handling, and fingering; avoid all exposure to hazards such as dangerous moving machinery and unprotected heights; limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts; involving only work-

related decisions with few, if any, workplace changes; occasional interaction with the general public, coworker, and supervisors with no duty to persuade others. (Tr. 53). VE Zinsmeister testified such an individual could not perform Ms. Cooper's previous work, but could perform jobs in the national economy, including cleaner, housekeeping (DOT 323.687-014), merchandise marker (DOT 209.587-034), or routing clerk (DOT 222.687-022). (Tr. 53-54). All three positions are light physical demand level, SVP 2. (*Id.*).

**Hypothetical Two.** VE Zinsmeister next assumed the hypothetical individual from Hypothetical One with the additional limitation that the individual would be permitted to sit or stand alternating positions for one or two minutes in the immediate vicinity of the workstation, no more frequently than every 30 minutes. (Tr. 54). VE Zinsmeister testified such an individual could not perform the cleaner or merchandise marker positions but could perform the routing clerk position. (*Id.*). Additionally, such an individual could perform jobs in the national economy including office helper (DOT 329.567-010) and electric accessories assembler (DOT 729.687-010), both categorized as light physical demand level, SVP 2. (Tr. 54-55).

**Hypothetical Three.** VE Zinsmeister next assumed the same individual from Hypothetical Two but assumed the individual could work only at the sedentary rather than light exertional level. (Tr. 55). VE Zinsmeister testified the individual could perform roles such as document preparer (DOT 249.587-018), circuit board inspector (DOT 729.684-110), or sack repairer (DOT 782.687-046). (*Id.*). All three are categorized SVP 2, sedentary exertional level. (*Id.*).

**Hypothetical Four.** Finally, VE Zinsmeister assumed the same individual from Hypothetical Three, with the following changes and additions: no bilateral upper extremity overhead reaching, occasional bilateral upper extremity fingering; able to sit for less than six hours

of an eight hour work day; require two extra breaks of 15 minutes each per eight hour shift in additional to regularly scheduled breaks; be absent more than two days per month and consistently off-task more than 15% of the work period. (Tr. 55-56). VE Zinsmeister testified such an individual would not be able to perform any work in the national economy. (Tr. 56). She testified employers tolerate only 15% off-task behavior and no more than one absence per month. (*Id.*).

On cross examination, VE Zinsmeister explained further some of the jobs she identified from the DOT. She testified a document preparer works with companies that need their documents microfilmed or copied because of space to consolidate huge volumes of paper. (Tr. 57). She did not provide names of any such companies. (*Id.*). Five years ago, she performed onsite analysis of the job, which involved scanning documents. (*Id.*). Because the job involves only frequently reaching, handling, and fingering, counsel asked what the person would be doing the one-third of the time they are not using their hands; VE Zinsmeister testified she did not know, but assumed people would take time to do other things like read the documents when they are not actually scanning them. (Tr. 57-58).

She also testified that the limitation to simple, routine tasks does not preclude the ability to carry out detailed instructions, because instructions can be given in detail and then be performed in simple, routine ways. (Tr. 58).

Ms. Cooper's counsel emphasized her functional capacity evaluation reflected sedentary work capacity due to a multitude of physical and psychological ailments that would prevent her from consistently attending and performing for an employer. (*Id.*). And, based on the VE's testimony, Ms. Cooper would be absent, late, or taking additional breaks, like the final hypothetical. (*Id.*). In addition to her pain, counsel reiterated her hygiene issues; the record reflects

13

she is often disheveled and malodorous, resulting in urinary tract infections, yeast infections, and

toe fungus. (Tr. 58-59). In combination with pulling her eyelashes out, compulsive behavior, losing

her hair, mental illness, chronic fatigue, memory problems, concentration issues, and low

tolerance for stress and changes to routine, counsel argued she would be prevented from attending

and performing for an employer. (Tr. 59).

## THE ALJ'S DECISION

The ALJ's decision, dated June 8, 2021, included the following findings of fact and

conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security
    Act through June 30, 2016.

2.  The claimant has not engaged in substantial gainful activity since July 16,
    2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: depression with bipolar
    not otherwise specified disorder; generalized anxiety disorder with obsessive
    compulsive disorder (OCD) with social anxiety disorder; chronic migraine
    without aura, without status migrainous [*sic*], not intractable / intractable
    chronic migraine, without aura and with status migrainosus with headache
    unspecified; and minimal posterior cervical disc bulging, without early
    degenerative changes with scoliosis, status post surgeries (20 CFR
    404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments
    that meets or medically equals the severity of one of the listed impairments
    in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
    404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that
    the claimant has the residual functional capacity to perform light work as
    defined in 20 CFR 404.1567(b) and 416.967(b) except: Postural limitation
    of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps
    and stairs. Occasional stooping, kneeling, crouching and crawling.
    Manipulative limitation of frequent use of the bilateral upper extremities
    for reaching, handling, and fingering. Environmental limitation to avoid all
    exposure to hazards, such as dangerous moving machinery and unprotected

heights. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors. No duties to persuade others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on January 31, 1991 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 16, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-32).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

16

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Cooper brings two arguments on review: first, the ALJ erred in analyzing Ms. Cooper's headaches and fibromyalgia, and second, the ALJ erred in not including the limitations set forth by reviewing and treating sources, which he found inconsistent and unsupported by the record evidence. (Pl.'s Br., ECF # 8, PageID 1183-1196). I discuss each argument in turn.

**I. Substantial evidence supports the ALJ's determination Ms. Cooper's fibromyalgia and headaches did not equate to any Listings, but the ALJ failed to explain the RFC's omission of limitations resulting from fibromyalgia.**

Ms. Cooper argues the ALJ erred in finding she did not have headaches at the requisite frequency to meet Listing 11.02 and in finding her fibromyalgia non-severe while also failing to discuss Social Security Ruling (SSR) 12-2p that deals with fibromyalgia. (Pl.'s Br., ECF # 8, PageID 1191-95).

The relevant Social Security regulations require the ALJ to find a claimant disabled if that person meets a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Yet, neither the listings nor the Sixth Circuit require the ALJ to "address every listing" or "to discuss listings that the applicant clearly does not meet." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that[ ] 'an ALJ can consider all

18

the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). The ALJ should discuss the relevant listing, however, where the record raises "a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990); *see also Sheeks*, 544 F. App'x at 641.

Ms. Cooper must do more than point to evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether she has satisfied a listing. *Sheeks*, 544 F. App'x at 641-42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates he or she reasonably could meet or equal every requirement of the listing. *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001) (claimant must satisfy the diagnostic description *and* one of the four sets of criteria); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found to be severe at Step Two where the claimant put forth evidence that possibly could meet the relevant listing). Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

A.      Primary Headache Disorder

 Ms. Cooper argues the ALJ's examination under SSR 19-4p of her headaches "failed to complete the requisite analysis." (Pl.'s Br., ECF #8, PageID 1194). She goes on to argue SSR 19-4p considers a primary headache disorder in conjunction with Listing 11.02, which is satisfied "when the seizures/headaches occur at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." (*Id.*). The ALJ, Ms. Cooper argues, therefore erred when he failed to discuss the frequency of the headaches in conjunction with Listing 11.02 as set forth in SSR 19-4p. (*Id.*).

Regarding Ms. Cooper's headaches, the ALJ concluded as follows:

The undersigned has also considered SSR 19-4p. Primary headache disorder or migraines is not a listed impairment in the Listing of Impairments (listings); however . . . we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing. Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder or migraines may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing. The claimant's headache disorder does not meet or equal the specific criteria enumerated in Listings 11.02. Consistent with the findings below, the record is devoid of evidence that the claimant has had generalized tonic-clonic seizures occurring at least once a month for at least three consecutive months or dyscognitive seizures occurring at least once a week for at least three consecutive months despite treatment; or generalized tonic-clonic seizures occurring at least once every two months for at least four consecutive months or dyscognitive seizures occurring at least every two weeks for at least three months despite treatment and resulting in a marked limitation in either physical functioning; understanding, remembering or applying information; interacting with others; concentration, persistence and pace; or adapting and managing oneself.

(Tr. 53-54).

The beginning of the ALJ's analysis mirrors SSR 19-4p in acknowledging that primary headache disorder can medically equal Listing 11.02. However, the remainder of the analysis looks

only to whether there is record evidence of a seizure disorder meeting Listing 11.02, not whether there is record evidence of a primary headache disorder that medically equals the criteria of the listing. Importantly, SSR 19-4p goes on to explain exactly how a primary headache disorder might medically equal 11.02:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p, 2019 WL 4169635 at *7-8.

The ALJ failed to engage in this analysis. He did not consider the above factors in determining whether Ms. Cooper's headaches were medically equal in severity and duration to the criteria in Listing 11.02. Rather, he acknowledged primary headache disorder can medically equal Listing 11.02, but instead of discussing whether it did, analyzed whether she actually met Listing

11.02 for epilepsy. Given no record of any seizures whatsoever, Ms. Cooper, of course, did not meet the listing.

That said, this error is not ground for reversal unless Ms. Cooper can point to specific evidence demonstrating she reasonably could meet or equal every requirement of the listing. *See Sullivan*, 493 U.S. at 530. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Smith-Johnsons v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014).

To meet either Listing 11.02B and 11.02D, Ms. Cooper needs to point to evidence demonstrating she experiences a headache event occurring at a certain frequency (once a week for Listing 11.02B and once every two weeks for Listing 11.02D) for three consecutive months despite adherence to prescribed treatment. In her brief, Ms. Cooper points to evidence that her neurologist noted variants of migraines, including constant headaches two weeks after injection. (Pl.'s Br., ECF #8, PageID 1194-95; Tr. 674, 763, 766). As of November 16, 2020, Ms. Cooper experienced headaches more than fifteen days a month and migraines nearly daily. (Tr. 769). She reported migraines "nearly daily" at a follow-up appointment on December 21, 2020. (Tr. 767). But by February 10, 2021, she reported her migraines were "well controlled" and the "Ajovy is working very well." (Tr. 763). As of March 29, 2021, she was again having severe, chronic, daily headaches lasting up to 24 hours. (Tr. 945).

If true, Ms. Cooper was experiencing a headache about every other day for at least a two-month period in late 2020. But she points to no record evidence demonstrating she experienced headaches for a *three*-month period at the frequencies required under Listing 11.02B (once a week) or Listing 11.02D (at least once every two weeks). In fact, by mid-February, her headaches

22

improved with treatment she herself described as working "very well." (Tr. 763). As such, Ms. Cooper has not demonstrated she reasonably could meet or equal every requirement of the listings because both relevant listings require a consecutive three-month period of frequent headaches despite treatment. *See Sullivan*, 493 U.S. at 530. Without that evidence, the ALJ did not commit reversible error by failing to evaluate her primary headache disorders properly under SSR 19-4p, because the result (that she does not meet the listing) would be the same. *See Smith-Johnsons v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014).

I therefore decline to recommend remand on this issue.

**B.      Fibromyalgia**

Ms. Cooper's next argument is less defined, but generally asserts the ALJ erred in failing to find her fibromyalgia severe and in failing to discuss SSR 12-2p in that assessment. (Pl.'s Br., ECF #8, PageID 1194-96; SSR 12-2p, 2012 WL 3104869). She also argues the ALJ failed to address Ms. Cooper's fibromyalgia in the RFC.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007); *see also* SSR 12-2p. Physical and neurological examinations typically yield normal results. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). There are no laboratory tests to confirm its presence or severity; fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Because of the unique difficulties associated with the diagnosis and treatment of fibromyalgia, "opinions that focus solely upon objective evidence are not particularly relevant." *Rogers*, 486 F.3d at 245. In cases involving fibromyalgia, applying the

23

usual disability analysis with its focus on objective evidence is not appropriate. *Id.* at 243-46. This places a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis. *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003).

       1.    **Severity**

In this Circuit, the Step Two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a *de minimis* hurdle in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The Sixth Circuit has determined the failure to analyze the character of other impairments at Step Two is not reversible error so long as the ALJ has already determined at least one of the claimant's impairments is severe. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ's finding of least one severe impairment means Ms. Cooper has cleared Step Two and therefore failure to find any other severe impairment constitutes harmless error. *Anthony*, 266 F. App'x at 457 (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987)). Whether any remaining impairments are severe is not "legally relevant" given the ALJ's determination that one impairment was severe and therefore, the ALJ had to consider all impairments in the remaining steps. *Id.*

The ALJ found Ms. Cooper to have multiple severe impairments: depression with bipolar not otherwise specified disorder; generalized anxiety disorder with obsessive compulsive disorder (OCD) with social anxiety disorder; chronic migraine without aura, without status migrainous, not intractable/intractable chronic migraine, without aura and with status migrainous with headache unspecified; and minimal posterior cervical disc bulging, without early degenerative changes with scoliosis, status post surgeries. (Tr. 16). Because he found those impairments severe, the failure to

24

find Ms. Cooper's fibromyalgia severe constitutes harmless error. *Anthony*, 266 F. App'x at 457.

Thus, Ms. Cooper's argument that the ALJ erred in failing to find her fibromyalgia severe is not

well-taken.

       **2.**      **SSR 12-2p**

Ms. Cooper also argues the ALJ erred in failing to discuss SSR 12-2p in his assessment of

her fibromyalgia. Most notably, she argues the ALJ should have followed the ruling's instructions

regarding "longitudinal" records: "[f]or a person with [fibromyalgia], we will consider a

longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane

so that a person may have 'bad days and good days.'" SSR 12-2p, 2012 WL 3104869 at *5-6.

The ALJ did reference SSR 12-2p in determining Ms. Cooper's fibromyalgia, although non-

severe, did not equate to any listing:

> In terms of the claimant's fibromyalgia, because there is no Listing for fibromyalgia,
> the claimant's impairment was evaluated under Listing 14.09 for Inflammatory
> Arthritis and under Listing 11.14 for Peripheral Neuropathy. Fibromyalgia
> syndrome is a chronic musculoskeletal disorder characterized by pain, muscle
> stiffness, pervasive fatigue, and non-restorative sleep, often with an absence of
> abnormal diagnostic findings and laboratory tests. Definable tender points are also
> characteristics of fibromyalgia. A diagnosis of fibromyalgia is usually established
> under the American College of Rheumatology (ACR) guidelines based on a history
> of widespread pain and specific pain in at least 11 of the 18 tender point sites on
> digital palpation. Fibromyalgia may also be considered if there is 1) a history of
> widespread pain, 2) repeated manifestations of six or more of six or more of
> fibromyalgia symptoms, signs or cooccurring conditions, and 3) evidence that other
> disorders that could cause these repeated manifestations of symptoms, signs or co-
> occurring conditions were excluded. (SSR 12-2p). No acceptable medical source has
> mentioned fibromyalgia findings equivalent in severity to the criteria of any listed
> impairment.[1]

---

[1]      In her reply brief, Ms. Cooper misunderstands the final sentence of this paragraph.
She states: "[i]n his decision, the ALJ found that no acceptable medical source had mentioned
fibromyalgia findings (Tr. 22)....Dr. Haladay, the treating rheumatologist, found 14 of 18 tender
points in January 2016 (Tr. 376)." (Pl.'s Reply Br., ECF #10, PagID 1227). This mischaracterizes
the ALJ's statement. The ALJ explains here that no acceptable medical source mentioned

(Tr. 22).

Ms. Cooper cites no evidence demonstrating the ALJ failed to give proper consideration under SSR 12-2p at Steps Two or Three. The ALJ followed the instructions in SSR 12-2p both by considering more than two years of the longitudinal waxing and waning of Ms. Cooper's symptoms as well as by referencing the ruling explicitly in his analysis.[2] SSR 12-2p requires no more of the ALJ at Steps Two of Three, and I therefore find that the ALJ properly utilized SSR 12-2p in his determination of the severity of Ms. Cooper's fibromyalgia, as well as in his Step Three analysis as to whether the condition equated to any listing.

3.    RFC

The ALJ's RFC determination with respect to fibromyalgia is another matter, however. Ms. Cooper compares this case to *Jones v. Comm'r of Soc. Sec.*, No. 21-cv-1309, 2022 WL 3567412 (N.D. Ohio Jul. 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio. Aug. 18, 2022), where I previously remanded a determination in part because the ALJ did not properly

---

fibromyalgia findings that would equate to a listing, not that no acceptable medical source mentioned fibromyalgia findings *at all*. The record clearly demonstrates a majority of Ms. Cooper's treating and reviewing medical practitioners agree she suffers from fibromyalgia.

[2]    "As in all claims for disability benefits, we need objective medical evidence to establish the presence of an MDI. When a person alleges [fibromyalgia], longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment. In cases involving [fibromyalgia], as in any case, we will make every reasonable effort to obtain all available, relevant evidence to ensure appropriate and thorough evaluation...We will generally request evidence for the 12-month period before the date of application unless we have reason to believe that we need evidence from an earlier period, or unless the alleged onset of disability is less than 12 months before the date of application. In the latter case, we may still request evidence from before the alleged onset date if we have reason to believe that it could be relevant to a finding about the existence, severity, or duration of the disorder, or to establish the onset of disability." SSR 12-2p, 2012 WL 3104869 at *3-4.

evaluate the claimant's fibromyalgia. *Id.* at 11. *In Jones*, the ALJ rejected Ms. Jones's fibromyalgia diagnosis as self-reported and otherwise not corroborated by objective findings. *Id.*

The Sixth Circuit's ruling in *Rogers* requires a district court remand where an ALJ considering fibromyalgia dismisses a claimant's subjective statements in favor of objective findings. *See Rogers*, 486 F.3d at 244 ("[T]he ALJ's decision here impliedly dismissing or minimalizing Rogers' fibromyalgia and instead accepting the non-treating doctors' opinions as to her limitations from 'arthralgias' was not based upon substantial evidence."); *see also Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (remanding where the ALJ dismissed the claimant's subjective complaints of pain in favor of non-treating source opinions and failed to discuss the accepted medical standard for diagnosing fibromyalgia); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) (remanding where the ALJ failed to give good reasons for rejecting treating physicians' opinions and discrediting the claimant's subjective statements of their fibromyalgia symptoms); *Preston v. Sec'y of Health & Hum. Servs.*, 854 F.2d 815, 819-20 (6th Cir. 1988) (finding substantial evidence lacking and remanding with an award of benefits where the ALJ relied on normal clinical and test results as evidence of non-disability for fibromyalgia); *Lower v. Comm'r of Soc. Sec.*, No. 19-cv-2071, 2020 WL 5215391, at *11 (N.D. Ohio Aug. 17, 2020) ("[T]he ALJ gave no specific evaluation of the limiting effects of Plaintiff's fibromyalgia condition, relied solely on objective evidence in assessing her credibility, and improperly dismissed the opinion of the physician treating her fibromyalgia. Thus, remand is necessary for the ALJ to properly evaluate such."), *report and recommendation adopted*, 2020 WL 5203487 (N.D. Ohio Sept. 1, 2020).

27

This case differs slightly from *Jones* in that the ALJ here does not question Ms. Cooper's diagnosis of fibromyalgia or dismiss the impairment as "self-diagnosed." But he implicitly dismisses her reported symptoms without explanation by failing to mention them, or any objective medical evidence corroborating or contradicting them, in any way when determining her RFC. At no point in explaining the limitations of the RFC did the ALJ explain (1) what symptoms, complaints, or limitations resulted from Ms. Cooper's fibromyalgia, or (2) why he did not find them consistent with or supported by other record evidence, especially given that application of the usual disability analysis with its focus on objective evidence is not appropriate in cases involving fibromyalgia. *Rogers*, 486 F.3d. at 243-46. Or, if he did find them consistent and supported by the record, he failed to explain why such impairments did not warrant any limitations in the RFC.

Reading the opinion as a whole, the ALJ clearly considered Ms. Cooper's subjective complaints related to fibromyalgia, including hair loss, inability to sit for more than a couple of hours, fatigue from standing, constant pain, and poor memory. (Tr. 23). He evaluated medical opinion evidence related to fibromyalgia (Tr. 27- 29), including the prior administrative medical findings of Dr. Mikalov (see Tr. 94, 95, 105, 106), PT Hamlin (Tr. 924, 926), and NP Case (Tr. 1088). In terms of the longitudinal record documenting Ms. Cooper's fibromyalgia, the ALJ reiterated the record evidence of the fibromyalgia symptoms Ms. Cooper experienced from 2019 through the hearing date in 2021, a period of over two years in comparison to SSR 12-2p's recommendation to consider the at least the previous 12 months. *See* SSR 12-2p, 2012 WL 3104869, at *3-4. Despite citing these records and mentioning Ms. Cooper's reported symptoms, the ALJ did not explain why the RFC includes no limitations associated with her fibromyalgia.

28

Without knowing why the ALJ believed no fibromyalgia limitations were warranted, I cannot evaluate whether the RFC is supported by substantial evidence.

For these reasons, I recommend the District Court remand this matter for further proceedings.

## II.   The ALJ properly evaluated medical opinion evidence of PT Hamlin and Dr. Johnston, but failed to explain why NP Case's opinion was unsupported by the record.

Ms. Cooper also challenges the ALJ's evaluation of medical opinion evidence in determining the remainder of her RFC. (Pl.'s Br., ECF #8, PageID 1183).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5); § 416.920c(b)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(a). With respect to the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2).

The ALJ is required to "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(b)(2). Conversely, the ALJ "may, but [is] not required to, explain"

how he considered the relationship, specialization, and other factors set forth in paragraphs (c)(3)

through (c)(5) of the regulation. *Id.* When two or more medical opinions about the same issue are

both equally well-supported and consistent with the record, but are not exactly the same, the ALJ is

required to "articulate how [he] considered the other most persuasive factors" of relationship,

specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. 20

C.F.R. §§ 404.1520c(b)(3) & 416.920c(b)(3).

The ALJ found the opinion of PT Hamlin and Dr. Mikalov somewhat persuasive (Tr. 27-

28, 29), the opinion of NP Case not fully persuasive (Tr. 28), the opinion of Dr. Cooper

persuasive (*Id.*), the prior administrative medical findings of Dr. Rosch and Dr. Gilyot-

Montgomery unpersuasive (Tr. 28-29), and the prior administrative medical findings of Dr.

Johnston persuasive "overall." (*Id.*). Ms. Cooper argues that the ALJ's evaluation of the opinions of

NP Case and PT Hamlin are not supported by substantial evidence. She does not challenge the

ALJ's evaluation of Dr. Cooper's opinion or the prior administrative medical findings, though she

argues the RFC does not account for all the limitations assessed by Dr. Johnston. (*See* Pl.'s Br.,

ECF #8, PageID 1183-90). The only opinions at issue, then, are those of PT Hamlin, NP Case, and

Dr. Johnston.

## A.     PT Hamlin

PT Hamlin completed a functional capacity report (FCR), opining: "[u]nlikely that with her

multitude of pain symptoms and psychological ailments that she would be able to consistently

attend and perform for an employer." (Tr. 938).

The ALJ explained:

The undersigned finds that this is only somewhat persuasive to the extent it is
consistent with and supported by that the claimant had scoliosis and minimal
cervical disc bulging (2F, 30F, 7F). However, it is inconsistent with that [s]he had

30

normal and unassisted gait (12F). She had normal Romberg and Babinski and normal manual dexterity with normal gait (12F). It is inconsistent with that she had no difficulty with her gait, ambulation, fingering, manual dexterity, speech, and had no difficulty with sitting, standing (12F). It is further noted that the physical therapist is not an acceptable medical source to opine as to the claimant's psychological ailments and therefore, finds that this is not persuasive as that is inconsistent with and not supported by that the claimant was doing well on her prescribed medications and able to plan a wedding except for financial reasons; and that she was advised to do aerobic exercise thirty minutes a day by her practitioner (4F, 7F, 30F). It is further inconsistent in that she had no tremors or dizziness in December 2020 after medication changes, nonetheless, the undersigned has accounted for these in the residual functional capacity (26F). It is further inconsistent with her neurological examination that she reported her medication was working very well, and her migraines were well controlled and her tremors were doing very well (23F). She was well-kempt and had normal muscle bulk, tone, and strength (Id.).

(Tr. 27-28).

As a threshold matter, Ms. Cooper misunderstands the ALJ's determination and argues the ALJ committed harmful error in failing to adopt the FCR because PT Hamlin is not an appropriate medical source. (Pl.'s Br., ECF #8, PageID 1186). She argues because the exam was ordered by the treating nurse practitioner and she adopted the findings in her medical source statement, the ALJ cannot disregard it because of PT Hamlin is a physical therapist rather than a physician or other appropriate medical source. (Id.).

The ALJ's explanation conveys he is disregarding PT Hamlin's opinions only as to Ms. Cooper's psychological ailments because PT Hamlin is not an acceptable medical source to opine on psychological conditions. Additionally, the ALJ explained PT Hamlin's conclusions regarding Ms. Cooper's mental impairments were inconsistent with and not supported by the fact she was doing well on her prescribed medications, was able to plan a wedding except for financial reasons, and was advised by her practitioner to do aerobic exercise thirty minutes a day. (Tr. 27-28). Although it is not entirely clear how being instructed to do aerobic exercise is inconsistent with

31

Ms. Cooper's alleged psychological ailments, the remainder of the explanation, especially given that PT Hamlin is not a mental health professional, sufficiently supports the ALJ's finding that PT Hamlin's opinion regarding Ms. Cooper's mental impairments was unpersuasive and unsupported.

Ms. Cooper next argues the ALJ erred in disregarding the FCR as being based on self-reported symptoms, explaining the report was a result of pain questionnaires, placebo testing, and pain ratings corroborating Ms. Cooper's subjective reports, making it therefore consistent with and supported by record evidence. (Pl.'s Br., ECF #8, PageID 1186). According to the Commissioner, Ms. Cooper again misunderstands the determination, arguing the ALJ did not discount the FCR as being based on self-reported symptoms, but rather, when fully evaluating the FCR and opinion of PT Hamlin, the ALJ accurately explained that the report began by summarizing Ms. Cooper's reported limitations. (Comm'r's Br., ECF #9, PageID 1216) (citing Tr. 27).

The FCR includes a table listing Ms. Cooper's self-reported functional capabilities (e.g., limited fingering and writing) and the perceived causes of those limitations (e.g., tremoring in hands). (*Id.*) (citing Tr. 925-26). The ALJ began summarizing this portion of the FCR by stating "it was self-reported . . ." before each reported limitation. (Tr. 27). The ALJ does not discount the FCR for its self-reports, but rather provides an accurate summary that begins with PT Hamlin documenting Ms. Cooper's reported impairments. (*Id.*). I therefore find this argument unpersuasive.

In terms of whether the ALJ properly evaluated the medical source statement under 20 C.F.R. §§ 404.1520c(c)(1)-(5) and 416.920c(b)(1)-(5) as regards PT Hamlin's opinion, the ALJ highlighted specific ways in which the opinion was not supported by or was inconsistent with the evidence, noting the discrepancies between PT Hamlin's assessment that Ms. Cooper could only

occasionally walk and the lack of medical evidence of gait abnormalities (either observed by PT Hamlin or any other medical source, including Dr. Cooper) and the recommendation by a treatment provider that she engage in aerobic exercise. (Tr. 27-28; *see also* Tr. 371, 376, 383). The ALJ concluded that PT Hamlin's opinion was only somewhat persuasive to the extent the record confirmed the presence of scoliosis and minimal cervical disc bulging. (Tr. 27). Although the ALJ observed that PT Hamlin's examination did not substantiate Ms. Cooper's alleged manipulative limitations, the ALJ nevertheless accounted for them in the RFC. (Tr. 22, 27-28).

Considering the determination as a whole, I conclude the ALJ provided sufficient explanation for what portions of PT Hamlin's FCR he found consistent with and supported by the remainder of the record. The ALJ also included limitations in the RFC as a result of those opinions. I find Ms. Cooper's argument as to PT Hamlin's opinion unpersuasive and recommend the District Court reject it.

### B.     NP Case

Ms. Cooper's second challenge is to the ALJ's evaluation of NP Case's opinion (Pl.'s Br., ECF #8, PageID 1185), which, in adopting PT Hamlin's FCR, projected Ms. Cooper would be absent more than four days per month, would have good days and bad days, and her physical and emotional impairments were reasonably consistent with the functional capacity test due to diagnoses of generalized anxiety, social anxiety, and OCD. (Tr. 1094). The ALJ provided the following explanation in his partial adoption of NP Case's medical source statement:

> The claimant's nurse practitioner adopted the functional capacity evaluation, and stated an opinion that based on the functional capacity test, that the claimant would be absent more than four days per month and that she would have good days and bad days and that the claimant's physical and emotional impairments were reasonably consistent with the functional capacity test due to diagnoses of generalized anxiety, social anxiety, and obsessive compulsive disorder (32F). The undersigned finds that this is not fully persuasive as it is inconsistent with and not

supported by the claimant's treatment notes that she was advised to do thirty minutes of aerobic exercise (2F, 30F, 7F). It is further inconsistent with her treatment notes that she was doing well on her medications, had no more hallucinations, was well kempt and able to care for her animals, and visit with her fiancé monthly, plan a wedding and she was appropriately attired with no acute distress, and she had normal attention and logical thoughts and was cooperative and she had neat appearances during treatment and was well groomed (25F, 4F). At her neurological examination, she was well-kempt and had normal muscle bulk, tone, and strength and therefore is inconsistent with and not supported by that she reported her medication was working very well and her migraines were well controlled and her tremors were doing very well (23F).

(Tr. 28).

This explanation is, at best, confusing. As noted above, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). The ALJ appears to reject NP Case's opinion regarding a number of Ms. Cooper's symptoms based on a plethora of seemingly unrelated evidence. The ALJ's explanation lacks a logical bridge between the cited evidence and the resulting conclusion.

The problem stems from the ALJ grouping each of NP Case's opinions together and dismissing them together based on a large body of evidence without regard to what evidence contradicts what opinion. Without knowing the specific evidence that contradicts an opinion, Ms. Cooper and the reviewing court are left to speculate about the ALJ's logic in reaching his conclusion.

Two examples illustrate the point. First, the ALJ rejected NP Case's opinion that Ms. Cooper would be absent more than four days per month, citing, *inter alia*, that Ms. Cooper was well-kempt and had normal muscle bulk, tone, and strength. (Tr. 28). The ALJ's opinion does not

34

explain, nor is it obvious to me, how Ms. Cooper's probable absences (or lack thereof) are more or less likely given her appearance or her muscular development. Second, it is not clear how Ms. Cooper's "physical and emotional impairments being reasonably consistent with the functional capacity test due to her psychological diagnoses" is inconsistent with and not supported by the fact that she was planning a wedding, taking care of pets, or was prescribed mild aerobic exercise. (*Id.*). The ALJ did not explain this reasoning.

Thus, with respect to NP Case's opinion, I find the ALJ failed to build a logical bridge between the cited evidence and his conclusion regarding the persuasiveness of her evaluation and opinion. I recommend the District Court remand on this ground, as well.

### C.      Dr. Johnston

Finally, Ms. Cooper argues the findings of reviewing psychologist Dr. Johnston should have been adopted in the RFC because the ALJ found the opinion persuasive but failed to include all recommended limitations. (Pl.'s Br., ECF #8, PageID 1189). The Commissioner argues the ALJ did not find the prior administrative medical findings entirely persuasive and, to the extent the ALJ did not fully adopt the assessed limitations, he was not obligated to provide further explanation of the rationale. (Comm'r's Br., ECF #9, PageID 1220). Indeed, "the Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion." *Lanthron v. Comm'r. of Soc. Sec.*, No. 3:20 CV 02116, 2022 WL 1458686, at *24 (N.D. Ohio Jan. 5, 2022) (citing *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016)); *see also Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *10 (N.D. Ohio Sept. 11, 2019).

The ALJ said this about Dr. Johnston's opinion:

> At the reconsideration level, the State agency psychology consultants opined that the claimant could perform simple, repetitive one- to two-step tasks, in a work setting with no demand for fast pace; superficial, occasional contact with the general public, coworkers, and supervisors, where she i[s] not expected to maintain a friendly, persuasive demeanor; in a work setting with routine and predictable duties, without strict production standards (6A; 8A). The undersigned finds that this is overall persuasive to the extent that it is consistent with and supported by that the claimant had depression and anxiety with obsessive compulsive disorder (13F, 4F, 25F). The undersigned finds that the claimant is further limited to work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any workplace changes. Occasional interaction with the general public, coworkers, and supervisors. No duties to persuade others.

(Tr. 29).

The recommendation and RFC are largely identical. Dr. Johnston recommended Ms. Cooper be limited to performing simple, repetitive one- to two-step tasks, and the RFC limits Ms. Cooper to simple, routine, and repetitive tasks. Dr. Johnston recommended no demand for a fast pace, and the RFC limits Ms. Cooper to a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts. Dr. Johnston recommended only superficial, occasional contact with the general public, coworkers, and supervisors, where she is not expected to maintain a friendly, persuasive demeanor. The RFC limits her to occasional interaction with the general public, coworkers, and supervisors with no duties to persuade others. To the extent these limitations do not exactly mirror Dr. Johnston's recommendation, Ms. Cooper makes no developed argument for why more restrictive limitations are needed.

The only restriction not specifically adopted in the RFC is Dr. Johnston's recommendation Ms. Cooper be limited to a work setting without strict production standards. Immediately after mentioning this recommended restriction, the ALJ stated "this is overall persuasive to the extent that it is consistent with and supported by that the claimant had depression and anxiety with

obsessive compulsive disorder," suggesting the possibility that her mental impairments do not necessarily prevent her from working under strict production standards. (Tr. 29). However, in light of the fact that the opinion was adopted almost in its entirety, paired with the Sixth Circuit's refusal to require an ALJ explain every omitted restriction from a non-treating physician's opinion, I find the ALJ did not err in his analysis and adoption of Dr. Johnston's opinion. Ms. Cooper's final argument is not persuasive, and therefore I decline to recommend remand on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: May 3, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v.*

*Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).